1
2
3
4          UNITED STATES DISTRICT COURT
5          NORTHERN DISTRICT OF CALIFORNIA
6
7    RONDELL L. JOHNSON,                    No. C 10-416 SI (pr)
8              Petitioner,                  **ORDER DENYING PETITION FOR
          v.                                WRIT OF HABEAS CORPUS AND
9                                           DENYING CERTIFICATE OF
                                            APPEALABILITY**
10   JAQUEZ, Warden,
11             Respondent.
12   _____/
13
14                           **INTRODUCTION**
15        Rondell L. Johnson filed this pro se action seeking a writ of habeas corpus under 28
16   U.S.C. § 2254.  The matter is now before the court for consideration of the merits of the habeas
17   petition.  For the reasons discussed below, the petition will be denied.
18
19                           **BACKGROUND**
20   I.   The Crimes
21        Johnson was convicted in Alameda County Superior Court of homicide, robbery,
22   attempted homicide, attempted robbery, and multiple other counts stemming from a series of
23   crimes which occurred mostly on October 3, 2000.  The following factual background is taken
24   from the order of the California Court of Appeal:
25        On April 29, 2004, defendant was charged by information with 20 crimes [FN1] as
          follows: 1) murder of Sareth So (Pen. Code, § 187, subd. (a)) [FN2] with an allegation
26        that the murder was committed during a robbery (§ 190.2, subd. (a)(17)(A)) and with use
          of a firearm causing death (§§ 12022.7, subd. (a), 12022.53, subd. (d)); 2) attempted
27        murder of Khout Oak (§§ 187, subd. (a), 664) with an allegation of use of a firearm; 3)
          attempted second degree robbery of Khout Oak (§ 211) with an allegation of use of a
28        firearm causing great bodily injury; 4) second degree robbery of Hai Van Le with an
          allegation of use of a firearm causing great bodily injury; 7) carjacking of Venius Winn
          (§ 215, subd. (a)) with an allegation of use of a firearm; 8) second degree robbery of John

Williams with an allegation of use of a firearm causing great bodily injury; 9) second degree robbery of Prentice Gray with an allegation of use of a firearm causing great bodily injury; 10) second degree robbery of Terry Edington with an allegation of use of a firearm causing great bodily injury; 11) second degree robbery of Ralph Santiago with allegations of use of a firearm and discharge of a firearm (§ 12022.53, subd. (c)), personal use of a firearm (§ 12022.5, subd. (a)(1), 12022.53, subd. (b)), and that defendant knew a principal was armed with a firearm during the commission of the offense (§ 12022, subd. (d)); 12) attempted murder of Ralph Santiago with an allegation of use of a firearm and that defendant knew a principal was armed with a firearm during the commission of the offense; 13) attempted second degree robbery of Gilberto Arreguin with an allegation of use of a firearm and that defendant knew a principal was armed with a firearm during the commission of the offense; 14) assault with a semiautomatic firearm on Gilberto Arreguin (§ 245, subd. (b)) with allegations of use of a firearm, great bodily injury (§ 12022.7, subd. (a)), and that defendant knew a principal was armed with a firearm during the commission of the offense; 15) second degree robbery of Michael Paige with an allegation of use of a firearm causing great bodily injury; 16) attempted murder of Michael Paige with an[] allegation of use of a firearm; 17) second degree robbery of Raymond Marquez with an allegation of use of a firearm causing great bodily injury; 18) second degree robbery of James Cuba with an allegation of use of a firearm causing great bodily injury; 19) attempted second degree robbery of Larry Rhymes with an allegation of use of a firearm causing great bodily injury; 20) assault with a firearm on Larry Rhymes with an allegation of use of a firearm; 21) receiving stolen property, a AAA card (§ 496, subd. (a)); and 24) possession of a firearm by a felon (§ 12021, subd. (a)(1)).  It was additionally alleged that defendant had suffered two prior convictions and had not remained free from prison for five years subsequent to either.  (§ 667.5, subd. (b).)

     FN1. The following listed numbers signify the count numbers in the information. Some counts refer only to the codefendant charged in the information and therefore are not listed here.

     FN2. Further statutory references are to the Penal Code.

Defendant waived his right to a jury trial.  At the court trial there was substantial evidence of the following facts:

John Williams testified that defendant held a gun to his chin when he was robbed in a Laundromat on October 3, 2000.  After Williams gave defendant money, defendant walked over to Prentice Gray, "placed the gun behind his back and asked him for his money and keys."  [FN3]  Gray was 10 to 12 feet from Williams.  Williams identified defendant at the lineup described more fully below.  He told the police that the man who robbed him was between four feet four inches and five feet six inches tall and 130 to 140 pounds.  He testified that in making the identification at the lineup the characteristic most important to him was defendant's "face because how close he was to me."  He was confident that defendant was the man who robbed him.

     FN3. Gray died prior to trial.

Michael Paige, a robbery victim who was shot, testified that the man who robbed him at approximately 4:00 a.m. on October 3, was African-American.  He stated that in the hospital three days after the robbery he watched the videotape of the lineup and was confident that he picked the man who robbed him based on his height, his clothes and his face.  He testified that the man who robbed him was five feet nine or ten inches tall. When shown the videotape of the lineup at trial (when defendant was not in the courtroom), Paige chose number four in the lineup, but defendant was in position number

three. He testified that he was "not really sure," explaining, "When I seen the lineup the first time, it was kind of hard to tell. I was on medication in the hospital, so it was kind of hard." [FN4] When asked if he saw the person in court who robbed him, he replied, "it's been a long time, five years, and people change, so it's hard to say." He was unsure if defendant was the man who shot him. Paige testified that he was "five six or five seven" and that the man who shot him was taller than Paige, though he did not know by how much. Paige identified the watch taken from him in the robbery that was recovered from defendant's pants pocket when he was arrested.

> FN4. The record does not indicate who Paige identified in the lineup when shown the videotape in the hospital.

Thomas Bartolero testified that he was robbed on September 16, 2000. At approximately 10:30 p.m., he was with a friend in his car when "someone came to my window, which I had left open, and pointed a gun at me and said he wanted my money. [¶]...[¶] He reached in and felt around my pocket and told me to empty out my pocket. So I pulled out my wallet. He grabbed that. And he also noticed a small compartment to the left side of my steering wheel and he opened that, grabbed some cash out of there." The wallet contained a "driver's license, Triple A card, bank card, old receipts." There was "another man who came to the passenger side window, which was rolled down, and he reached in and checked to see if [his friend] had any money and reached across, grabbed my keys out of the ignition, as well as opening up my glove compartment, taking everything out of there." Both men were African American. Bartolero's AAA card was later found with defendant's identification card at defendant's house.

Larry Rhymes testified that on October 3, 2000, at approximately 4:45 a.m., when dark, a car pulled alongside his car and the driver asked if Rhymes knew him. Rhymes answered that he believed he knew him. "Then he jumped out of his car and said, 'you don't know me' and pulled down his beanie cap. He... clicked back some... automatic weapon, and pulled down his mask. He had a beanie cap that was stretched down with a hole and eyes you could see out of." Defendant "came toward me and I bend my head down in the car and I smashed on the gas and drove to the back of the [apartment complex]." Defendant followed in his car. Rhymes stopped at the gates of the complex, which were locked, and tried to get out of his car but fell. Defendant "pulled up. He got out and asked me where was my money, give me your money. Hit me in the head a few times. I fell back down. He keep pulling, the chain went back to the gun again and clicked at my head. I had my hands over my head. I told him I didn't have any money on me, that I would have to go home." When defendant looked around, Rhymes ran. He heard defendant following him, "talking about killing me and a lady friend of mine." Rhymes eventually encountered the police who took him to the hospital.

Rhymes testified that he recognized defendant at the time of the assault, though he did not know his name. He identified defendant at trial. He stated that he had seen defendant "at least two or three times" prior to the assault. He identified defendant at the lineup as the man who had assaulted him.

Larry Rhymes' brother Kenneth testified that on the morning of October 3, he was waiting in the house for Rhymes to give him a ride to work. Rhymes went outside to warm up the car, and when he did not return, Kenneth went outside to look for him. Defendant appeared wearing a mask and pointing a gun and told Kenneth to get in the house. Kenneth testified that he knew the man was defendant even though he was wearing a mask because defendant returned approximately 30 minutes later not wearing a mask "and said, 'your brother is with me. He's all right.'" Kenneth identified defendant with a question mark at the lineup because he "was pretty much sure, but...

didn't want to convict somebody that didn't do it." Nevertheless, he said that defendant's face was the same as the man to whom he had spoken. His attention was also drawn to defendant in the lineup because defendant was the only one in the lineup who turned his face to the ceiling when he spoke.

Khout Oak testified that in October 2000 he and his wife Sareth So were employed delivering newspapers. On October 3, he drove to Emeryville, where he picked up the day's newspapers, and returned home at approximately 4:30 a.m. to meet his wife and Hai Le, both of whom helped deliver the newspapers. When he got out of the van, he noticed that Le was in his car talking to a Black man who was standing beside the car. Le later identified the man as defendant. Defendant approached Oak and asked for money, threatening to shoot him. Oak walked around the front of the van to unload the newspapers and defendant followed him. His wife then came out of the house to help unload the newspapers. Defendant walked toward her and "put a gun toward my wife, pointed a gun to my wife and then said that if you don't give me money, I'm going to shoot your wife." Oak approached his wife and defendant pointed the gun at him and tried to shoot, but the gun did not discharge. Defendant "held my wife's hand and then pushed her into... the van, and then he shoot in there. [¶]...[¶] The first, the second time, the bullet did not c[o]me out. I heard the click." "After that, my wife struggle and then [he] push my wife into the van and then the third time he tried, I heard the gun sound."

At trial, Oak described the man who shot his wife as an African-American male between five feet nine inches to six feet tall with a medium build. Oak could not describe the man's skin tone, what he was wearing or if he had facial hair because it was dark at the time of the incident. At trial, Oak pointed to defendant and said, "I look at that person, the size and the height look similar to the one I remember. And I'm not sure whether he is the one or not." At the lineup, Oak believed that the person in position number one had a voice like the man who shot his wife, but nothing else about him was familiar. In his interview with the police after witnessing the lineup, Oak also stated that number one was a similar height to the man who shot his wife.

Hai Le testified that on the morning of October 3, he drove to Oak's house and parked his car. Defendant arrived, parked his car, approached Le and told him to roll down his window. When Le did so, defendant pointed a gun at Le and told him to give him money. Le gave his wallet to defendant. Oak arrived and defendant went to Oak's van. Le identified defendant at trial as the man who robbed him. He was confident that he recognized defendant's face. At the lineup he marked defendant with a question mark. He stated that he was "100 percent" certain that number three was the man who had robbed him but he was not completely sure that it was the same person who killed Sareth So, since he did not see the shooting but only heard the gunshot.

Raymond Marquez testified that on October 3, he and a coworker, James Cuba, were in a tow truck repossessing cars. Defendant approached them and asked them to tow a car. When Marquez and his partner were preparing to do so, defendant pointed a gun at Marquez, demanded money and threatened to shoot him. Marquez took $2 from his pocket and handed them to defendant. Defendant also took Marquez's cell phone and credit card from the truck. He told Marquez to call his coworker and when the coworker approached, defendant pointed the gun at him and said, "Give me your money or I'm going to shoot you." He went through the coworker's belongings, then ordered the two men to get back in their truck. They did so and drove away. During the incident defendant told Marquez that he had "already shot five people" that night. Marquez's cell phone was found in the car that defendant was driving when he was arrested.

Marquez described the robber as having "short, thin, two-inch hair. He had a chin, stripe

4

beard. I believe a goatee. About five ten, 200 pounds. [¶]...[¶] Black." At around 10:15 that morning, the police took Marquez to view defendant who was standing by a police car. Marquez identified defendant as the person who had robbed him. He also identified defendant at a hearing in 2003 and at trial. Marquez identified his cell phone and credit card at the police station.

Ralph Santiago testified that on October 3 at around 3:00 a.m. he was moving his car into a private lot at the bakery where he worked. Two Black men pulled alongside him in a car and asked for directions. The passenger got out of the car, approached Santiago, and demanded the hamburger Santiago was eating. Santiago gave him the hamburger. The man threw the hamburger back at Santiago "and said that he wanted my money." Santiago told him he did not have any money. The man showed Santiago a gun in the waistband of his pants. Santiago gave him a green ceramic mug with coins in it. The man threw the mug into his car and began to feel in Santiago's pockets. He told Santiago to get out of the car. During the confrontation, the driver of the other car was pointing a gun at Santiago. Santiago got out of his car and the passenger of the other car began to feel his pockets again. The driver of the other car said, "Just shoot him, man." The passenger stepped back and lifted the gun. Santiago put up his arm as the man shot him. The bullet went through his forearm and into his stomach. The passenger got back in the car and the men drove away. Santiago memorized the license plate number of the departing car and wrote it down after he ran inside the bakery.

At approximately 10:00 a.m. the morning of the attack, the police took Santiago to view a suspect, whom he identified "as possibly being the driver of the vehicle," though he was uncertain because the man was too far away. At the police station Santiago identified his green ceramic mug. Santiago attended the lineup on October 4 and marked defendant with a question mark "[b]ecause there was just a little bit of doubt in my mind." He did not "actually get to see the driver's full body. He was sitting down in the car seat leaning over, so, you know, I had doubt." He relied mostly on the voice in making his identification. Defendant also "looked more like the assailant than any of the others that were standing there." At the preliminary hearing and at trial he identified defendant as the driver. The street where the assault took place was well-lit and Santiago had no trouble seeing his assailants clearly.

Terry Wayne Edington testified that he was walking home on October 3 at about 2:30 a.m. when he was approached by two African-American men. One said, "What you got." Both men had guns. He described one of the men as "about six feet, six one or so... maybe 160, 165, -70 pounds." The second man he described as "shorter and heavier" "five eight, five nine, maybe five ten... maybe 170 pounds or so." The taller man "brushed around and finding my wallet, just kind of [patting] me down. When he found the wallet in the front right pocket, he pulled it out there, threw it and standing on the other side. And the shorter guy was using his gun to hit me with in my pocket, front pocket, and hit my cell phone. And that was when he made a statement. 'You got mobile. I'll kill this nigger.' And I said, 'You don't have to shoot me. You want it, take it.'" The man took the cell phone and Edington's keys. After the two men left, Edington went to a telephone booth and called the police. Edington attended the October 4 lineup and identified defendant as the shorter of the two men who robbed him. He also identified defendant at trial.

Venius Winn testified that on September 30, 2000, his car was carjacked by defendant. He recognized defendant from a previous contact, when an acquaintance had asked him to help obtain paint to paint defendant's house. On the day defendant took Winn's car, he threatened Winn with a silver .25 automatic, which Winn could identify because he used a similar gun when he was a police officer. Defendant was driving Winn's car when

5

1    he was arrested. Winn attended the October 4 lineup and identified defendant as the man
     who had taken his car. He also identified defendant at trial.

2
     Jesus Nava Angel testified that around 3:30 a.m. on October 3, he and three other men
3    were driving from San Jose to Oakland. Nava was asleep in the back seat. They had
     stopped to drop off one of the men, Arreguin, and Nava was awakened by someone
4    knocking on the passenger window. He saw a Black man outside of the car. After they
     left Arreguin, the man followed him. Nava returned after approximately five minutes and
5    found that Arreguin had been shot. Nava attended the lineup the following day and
     identified defendant as the man who knocked on the car window. The man's face was
6    fresh in his mind at the time of the lineup. He also identified defendant at trial.

7
     Lieutenant Yoell of the Oakland Police Department testified that on the morning of
8    October 3, he followed defendant by car because of descriptions of the vehicle that had
     been given by various victims of crimes committed that morning. The green coffee mug
     taken from Santiago was in the car that defendant was driving.
9

10   The trial court found defendant guilty of first degree murder with firearm use causing
     death (count 1); guilty of attempted second degree robbery with firearm use causing great
11   bodily injury (counts 3 and 19); guilty of second degree robbery with firearm use causing
     great bodily injury (counts 4, 8, 9, 10, 15, 17, and 18); guilty of second degree robbery
12   with a firearm (count 11) but that the additional allegation was not true; guilty of
     attempted homicide with a firearm (counts 12 and 16) but that the additional allegations
13   were not true; guilty of assault with a semi-automatic firearm (count 14) but that
     additional allegations were not true; guilty of assault with a firearm (count 20); guilty of
14   receiving stolen property (count 21); and guilty of possession of a firearm by a felon
     (count 24). The court found that defendant was not guilty of attempted murder (count 2);
15   carjacking (count 7); or attempted second degree robbery (count 13).

16   Defendant was sentenced to 75 years to life imprisonment[] [FN5] and timely filed a
     notice of appeal.

17
          FN5. The Attorney General concedes that the abstract of judgment should be
18        corrected to reflect that defendant was sentenced to 25 years to life imprisonment
          on count 1, and not, as the abstract of judgment currently states, life without
19        possibility of parole.

20   Cal. Ct. App. Opinion, pp. 1-10; Ans. Ex. F.

21

22   II.    Procedural History

23         Johnson appealed and challenged the fairness of the lineup where several of the victims

24   identified him as the perpetrator of the crimes. His conviction was affirmed by the California

25   Court of Appeal in a reasoned opinion, and his petition for review was denied by the California

26   Supreme Court. Johnson filed state habeas petitions in superior, appellate and high courts, with

27   the California Supreme Court denying review on December 23, 2009.

28         On January 28, 2010, Johnson filed this action seeking a writ of habeas corpus. The

action was stayed while Johnson exhausted state court remedies for several of the claims in the petition.  After Johnson filed notice indicating that he had completed exhaustion, the matter was reopened on April 20, 2012.  The Court ordered Respondent to show cause why the petition should not be granted, finding the following claims cognizable: (1) Johnson's right to due process and Sixth Amendment right to confront witnesses were violated when he "was viewed and identified in an unfair suggestive lineup"; (2) trial counsel provided ineffective assistance of counsel by failing to assert a "delayed arraignment" argument in connection with challenging the lineup; (3) he was denied a "fair and independent [appellate] review" because a pro tem justice on the appellate court panel that decided his case was a superior court judge from the same county and courthouse in which his trial was held; (4) he was denied a prompt arraignment before the lineup; and (5) he was denied counsel at the physical lineup.  Respondent filed an answer and Johnson filed a traverse.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged conviction occurred in Alameda County, California, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that the state judicial remedies were exhausted for the claims in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

I.    Challenges Involving the Lineup (Claim Nos. 1 and 5)

Johnson claims that the physical lineup that took place on October 4, 2000, violated his right to due process and Sixth Amendment right to confront witnesses because it was unfair and

8

suggestive.  Johnson also claims that he was denied counsel at the lineup.

The state appellate court set forth the following facts related to this claim:

Sergeant Cruz of the Oakland Police Department testified concerning the lineup procedures.  On October 3, 2000, he was assigned to investigate the So homicide and the other robberies and shootings with which defendant was charged.  The lineup occurred on October 4 at around 7:00 p.m.  Defendant was under arrest but had not yet been charged.  Six people, including defendant, participated in the lineup.  Defendant chose the five "fillers" in the lineup from inmates at the jail where he was being held.  Sergeant Cruz changed one of the men because "he was a man in his mid 40s and I felt that was too over the top for that lineup" because the man was approximately twice defendant's age.  Defendant approved all of the fillers and did not request that any of them be changed.  Defendant was permitted to select the order in which the men appeared in the lineup.  Defendant appeared in the number three position.

There were 17 witnesses present at the lineup.  They sat in a room separated from the men in the lineup by a one-way mirror.  Each was given a card on which to mark the number of the individual whom they identified.  Before the identification process began, witnesses were instructed not to mark their cards until all members of the lineup had been dismissed.  Not all 17 of the witnesses marked their cards, but those who did, made their marks after the men in the lineup had left.  Some made tentative identifications with a question mark instead of an "x" on their cards, and some identified members of the lineup other than defendant.

The videotape of the lineup was shown to three other victims who were hospitalized and could not be present at the jail.  One of the shooting victims who watched the videotape in the hospital identified defendant, but "increasingly became more tentative."  He "seemed to give a lot of weight to the voice of the person who shot him," initially identifying defendant's voice, but then stating "that number two or number six also sounded like the suspect who shot him."

The witnesses described defendant's height as between five feet seven inches and five feet nine inches.  Defendant is listed in the police report as being five feet nine inches tall, though at the hearing on the motion to exclude the lineup he was measured and found to be between five feet seven and five feet eight inches tall.  The other members of the lineup were five feet ten inches, five feet nine inches, five feet seven inches, six feet two inches and six feet four inches tall.  The witnesses ascribed a range of skin tones to defendant, with only some describing him as "dark complected."  The other person who was closest to defendant's height, number five in the lineup, had a lighter complexion than defendant, but he was about the same age, was the same ethnicity and had the same hairstyle as defendant.  Sergeant Cruz testified that "hair length is important.  The characteristics of a person are important.  Height, I give limited value to height and that's because in my experience most IDs aren't based on height.  Somebody doesn't tell me, oh, that person, he's the right height, that's him.  Folks don't tell me that.  They tell me that's him.  That's his face.  That's him.  That's the way he acts.  That's him.  That's the way he moved.  That's him.  That's the way he talks.  Height was a limited value, in my experience, as far as physical lineups."

Defendant testified about the lineup.  He said that Sergeant Cruz instructed him "to go up to the jail to pick some people that resemble my complexion, my size and weight...."  "[T]hey took me to the felony tank side of the jail and there was some people in there that resemble me, but their hairstyle was different, the hair was different.  So when they got me over there I ask them can I go to the other tank because I see somebody that look

familiar to me, to my size and complexion and weight. They wouldn't let me go over to that side of the tank. They just select some people. I selected some people.... I picked I think two people out of the six, beside myself, two people that I picked, and the rest I believe they picked, from my knowledge."

Defendant stated that he picked the men who appeared in positions number one and five in the lineup. He stated that he picked them based on "[h]eight and complexion and the weight," although he stated that "number five was a lot more lighter than me, but he was the same height as myself." He stated that he remembered picking number five "because when they walked over to the felony tank, I picked a guy with dreadlocks and they said he couldn't come. I think they replaced him with number two. But I remember, to my knowledge, it's been five years, but I remember picking five." He continued, "I don't even remember picking two, four and six. I don't remember that. Because I knew I wouldn't pick number four because he was taller than me. Six is way taller than me. I know I wouldn't pick four and six. Maybe I picked two. Two – and two – one and two maybe, but I think to my knowledge I picked five, if I'm not mistaken." When asked "how many people did you personally pick out to be in your lineup," he replied, "It was really three, but they told one to go back."

On cross-examination defendant stated, "I think from what I can remember, I think that they had some people already, and that when they showed me these people, I said no, that these people don't match my description. So I said, no, let me pick the people. And he said, no, we already had these people. And I didn't – I didn't okay that." He stated that he told the officers "several times" that he did not want the three men they had chosen participating in the lineup. He stated that when he arrived at the jail, the police "had five picked out" for the lineup, and that they allowed defendant to replace two men but not the other three.

Defendant moved to suppress the identifications made at the lineup. The trial court ruled that it "believes the testimony of the officers that the defendant did pick the fillers. Sergeant Cruz did in fact replace the older person as Sergeant Cruz properly instructed the witness. (Sic.) Sergeant Cruz testified that, in his opinion and his experience, the voice, the way a person walks, the profile, hair, face and their age are more significant characteristics than the person's height. The fact that some of the people put a question mark on the chest of number three, I think belies the fact that the lineup was unduly suggestive or otherwise they would have placed on "x" on the chest. So anything about the lineup that might have had an impact, I think would only go to the weight since even the people – seven of the people I believe placed a question mark, so it wasn't so suggestive that they could absolutely identify the defendant but weren't sure. So I think that there's nothing about the way the lineup was conducted that was unduly suggestive that would taint the in-court identification.... Therefore, the motion to strike the in-court identification with prior identification of any witnesses is denied."

Cal. Ct. App. Opinion, pp. 10-13.

"A conviction which rests on a mistaken identification is a gross miscarriage of justice." Stovall v. Denno, 388 U.S. 293, 297 (1967). Thus, the Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the

10

evidence should be discounted as unworthy of credit." <u>Perry v. New Hampshire</u>, 132 S. Ct. 716, 720 (2012) (citing rights to counsel, compulsory process, confrontation, cross-examination, as examples).

Due process requires suppression of eyewitness identification evidence "when law enforcement officers use an identification procedure that is both suggestive and unnecessary." <u>Id.</u> at 718; <u>see</u> <u>Manson v. Brathwaite</u>, 432 U.S. 98, 107-09 (1977); <u>Neil v. Biggers</u>, 409 U.S. 188, 196-98 (1972). The purpose of this rule is "to deter police from rigging identification procedures." <u>Perry</u>, 132 S. Ct. at 721. Consequently, in "cases in which the suggestive circumstances were not arranged by law enforcement officers," due process does not require exclusion of the identification evidence. <u>Id.</u> at 720-21 (due process does not require exclusion of evidence that witness, in response to a police officer asking her to describe the suspect, pointed out her window to defendant standing in her parking lot after another officer had asked him not to leave). "The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." <u>Id.</u> at 721.

Where there has been improper state conduct in arranging unnecessarily suggestive pretrial identification procedures, moreover, this alone does not require exclusion of in-court identification testimony; the reliability of the eyewitness testimony is the "linchpin" in determining its admissibility. <u>Manson</u>, 432 U.S. at 100-14; <u>see</u> <u>United States v. Drake</u>, 543 F3d 1080, 1089 (9th Cir. 2008) (holding finding of impermissibly suggestive identification not compelled even though there was clear directive to witness that she was about to view "the robber," and suspect was handcuffed and surrounded by uniformed police officers when witness arrived). Identification testimony is inadmissible as a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure. See <u>Van Pilon v. Reed</u>, 799 F.2d 1332, 1338 (9th Cir. 1986).

1      An identification procedure is impermissibly suggestive when it emphasizes the focus

2 upon a single individual thereby increasing the likelihood of misidentification. See United States

3 v. Bagley, 772 F.2d 482, 493 (9th Cir. 1985), cert. denied, 475 U.S. 1023 (1986); see, e.g.,

4 United States v. Burdeau, 168 F.3d 352, 357-58 (9th Cir. 1999) (finding that photo placement,

5 hue and facial expression were insubstantial differences between defendant's photograph and the

6 others in a photographic array and did not create an impermissible suggestion that defendant was

7 the offender); Bagley, 772 F.2d at 493 (repeated showing of picture of individual impermissibly

8 reinforces image of picture in mind of viewer).  The ultimate question of the constitutionality

9 of pretrial identification procedures is a mixed question of law and fact. See Van Pilon, 799 F.2d

10 at 1336; Ponce v. Cupp, 735 F.2d 333, 336 (9th Cir. 1984).

11      Johnson's claim is without merit because there was no improper state action in the lineup

12 procedure.  When Johnson testified regarding the lineup, he stated that he was only allowed to

13 pick two of the fillers, and that he did not approve the fillers selected by the police.  See supra

14 at 10.  Contrary to Johnson's testimony, Sergeant Cruz testified that Johnson was instructed to

15 pick all five fillers from among the inmates at the jail where he was being held.  Id. at 9.  After

16 Johnson made his selections, Sergeant Cruz changed one of them because he appeared to be

17 twice Johnson's age.  Id.  He testified that Johnson approved all of the fillers and did not request

18 that any of them be changed.  Id.  Johnson was also permitted to select the order in which the

19 men appeared in the lineup, choosing the number three position for himself.  Id.  The trial court

20 denied Johnson's motion to suppress the identification evidence because he believed the

21 testimony of Sergeant Cruz.  This Court must give deference to the trial court's determination

22 that Sergeant Cruz's testimony was more credible than that of Johnson.  See Weaver v.

23 Palmateer, 455 F.3d 958 , 963 n.6 (9th Cir. 2006)(a state court's rejection of a claim following

24 a hearing at which directly contradictory statements are offered constitutes an implied credibility

25 determination by the state court that is entitled to deference under § 2254(d)(2)).  Based on

26 Sergeant Cruz's version of events, there is no indication of improper state conduct in the lineup

27 procedures because Johnson was given full control over all the fillers and approved the one

28

1    substitution made by Sergeant Cruz.

2         Even if we assume arguendo that there was improper state conduct, Johnson fails to show

3    that the challenged evidence was inadmissible because the identification procedure was neither

4    impermissibly suggestive nor were the identifications unreliable.   See Van Pilon, 799 F.2d at

5    1338.  Firstly, Johnson's arguments claiming suggestiveness, as follows (Docket No. 37-2 at 1),

6    are not persuasive: (1) he was the only man in the lineup who matched the description of the

7    culprit; (2) he was not adequately instructed or informed on how to choose the fillers; and  (3)

8    the witnesses were packed so close together that they were influenced by what other people

9    indicated on their identification cards.  None of these arguments are supported by the record or

10   any other evidence.  In denying Johnson's motion to suppress, the trial court determined that the

11   "fact that some of the people put a question mark on the chest of number three, I think belies the

12   fact that the lineup was unduly suggestive or otherwise they would have placed on 'x' on the

13   chest... – seven of the people I believe placed a question mark, so it wasn't so suggestive that

14   they could absolutely identify the defendant but weren't sure."  See supra at 10.  The fact that

15   seven witnesses were not able to make a positive identification suggests that Johnson was not

16   the only man in the lineup who matched the description of the culprit.  Furthermore, the state

17   appellate court reviewed the lineup tape and found "no differences in the appearance of those

18   in the lineup or in the manner in which the lineup was conducted to have been suggestive" nor

19   "any indication that witnesses conferred or were influenced by others in making their

20   identifications." Cal. Ct. App. Opinion, p. 14.  With respect to Johnson's second argument, there

21   is no constitutional requirement that Johnson receive proper training in selecting fillers for a

22   lineup.  Rather, he was provided with assistance when necessary as Sergeant Cruz replaced one

23   of Johnson's choices because he appeared too old.  Ultimately, Johnson fails to show that the

24   identification procedure unfairly emphasized the focus upon him, thereby increasing the

25   likelihood of misidentification.  See Bagley, 772 F.2d at 493.

26        With respect to the second prong, the state appellate court reviewed the reliability of the

27   testimony of the identifying witnesses and rejected Johnson's claim:

28

13

1

2   Moreover, to the extent other victims confidently identified defendant, the record contains
    numerous indications that their observations were reliable.  Winn and Larry Rhymes
3   recognized defendant from earlier contacts.  Kenneth Rhymes had a good opportunity to
    observe defendant when defendant returned and spoke to him.  Moreover, Kenneth
4   testified that his attention was drawn to defendant in the lineup because defendant looked
    up at the microphone when he spoke in an apparent attempt to avoid being observed
5   clearly.  Marquez did not attend the lineup but identified defendant the day of the crimes,
    at a hearing and at trial.  Le had ample opportunity to observe defendant during the events
6   leading to the shooting of his wife.  Williams observed defendant at close range in a well-
    lit Laundromat and relied on defendant's face, not his height, in making his identification.
7   Edington was also in close proximity to his assailants and had the opportunity to observe
    them.  Nava identified defendant after seeing him directly on the other side of a car
8   window.  All of the witnesses except Winn made their identifications within hours of the
    assaults... In short, the record provides absolutely no basis to question the reliability of
9   the evidence identifying defendant as the perpetrator of the many crimes for which he
    was convicted.

10  Cal. Ct. App. Opinion, pp. 16-17.

11      The state court's rejection of this claim was not contrary to, or an unreasonable

12  application of, clearly established federal law based on the evidence presented.  As discussed

13  above, the testimony of the witnesses at trial who identified Johnson as the culprit was reliable

14  because they had ample opportunity to see Johnson's face and overall appearance during the

15  commission of the crimes.  As the record shows, John Williams, whom Johnson robbed while

16  holding a gun to his chin, was able to identify Johnson by his face "because how close he was

17  to me."  See supra at 2.  Larry Rhymes recognized Johnson as someone he had seen at least two

18  or three times prior to the October 3, 2000 assault, and was able to identify him in the lineup and

19  at trial.  Id. at 3.  Hai Le identified Johnson as the man who shot him after robbing him in his

20  parked car, having had ample time to see Johnson's face during and after the robbery.  Id. at 4.

21  Venius Winn identified Johnson as the man who carjacked him, and also recognized him from

22  a previous contact.  Id. at 5-6.  Lastly, Jesus Angel was able to identify Johnson at the lineup

23  because his face was fresh in his mind from the encounter the day before; he also identified

24  Johnson at trial.  Id. at 6.  This testimony shows that the identification of Johnson as the culprit

25  was reliable and the admission of the lineup was not unreasonable.  Manson, 432 U.S. at 100-14

26      Lastly, even if the trial court erred in failing to suppress the challenged evidence and

27  violated Johnson's rights to due process and confront witnesses, Johnson is entitled to habeas

28

14

1   relief only if the error had a "substantial and injurious effect or influence in determining the

2   jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993). <u>Dillard v. Roe</u>, 244 F.3d 758,

3   767 n.7 (9th Cir. 2001).[1]   Here, the error was harmless because there was extensive physical

4   evidence of Johnson's guilt aside from the lineup evidence.  First of all, the car Johnson was

5   driving matched the description of the culprits' vehicle, and the victim of the carjacking was able

6   to describe Johnson's gun, which was similar to the one used in the homicide and robberies. <u>See</u>

7   <u>supra</u> at 6.  Secondly, several items from the string of robberies were found on Johnson's person

8   and in the car he was driving: a set of keys and a cell phone taken from Terry Edington, Michael

9   Paige's watch, Ralph Santiago's green mug, and Raymond Marquez's cell phone.  As the state

10   appellate court found, "[p]hysical evidence recovered from [Johnson], from the car he was

11   driving, and from his home connected him to the crimes."  Cal. Ct. App. Opinion, p. 16.

12   Because it cannot be said that the error by the trial court had a "substantial and injurious effect"

13   on the jury's verdict, Johnson is not entitled to habeas relief on this claim.

14       Lastly, Johnson's claim that his right to counsel was violated because he did not have

15   counsel during the lineup is without merit.  A defendant has a right to counsel at a post-

16   indictment lineup because it is a critical stage of the prosecution. <u>See</u> <u>United States v. Wade</u>,

17   388 U.S. 218, 236-37 (1967).  Counsel is not required at pre-indictment lineups, however,

18   because the right to counsel does not attach until adversary judicial proceedings have been

19   initiated against a defendant. <u>See</u> <u>Kirby v. Illinois</u>, 406 U.S. 682, 688-91 (1972).  Johnson's

20   right to counsel had not attached at the time of lineup because it took place before Johnson was

21   formally charged. <u>See</u> <u>supra</u> at 9.  Accordingly, the state courts' rejection of this claim was not

22   contrary to, or an unreasonable application of, clearly established federal law.

23

24       [1] Confrontation Clause claims are also subject to harmless error analysis. <u>United States</u>

25   <u>v. Nielsen</u>, 371 F.3d 574, 581 (9th Cir. 2004) (post-<u>Crawford</u> case); <u>see also</u> <u>United States v.</u>
     <u>Allen</u>, 425 F.3d 1231,1235 (9th Cir. 2005).  For purposes of federal habeas corpus review, the

26   standard applicable to violations of the Confrontation Clause is whether the inadmissible
     evidence had an actual and prejudicial effect upon the jury. <u>See</u> <u>Hernandez v. Small</u>, 282 F.3d

27   1132, 1144 (9th Cir. 2002) (citing <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)); <u>Webb v.</u>
     <u>Lewis</u>, 44 F.3d 1387, 1393 (9th Cir. ) (same).

28

1    II.    <u>Ineffective Assistance of Counsel (Claim No. 2)</u>

2            Johnson next claims that trial counsel provided ineffective assistance by failing to assert

3    a "delayed arraignment" argument in challenging the lineup.  Johnson raised this claim in his

4    state petition for a writ of habeas corpus, which the California Supreme Court summarily denied.

5    (Ans., Ex. K.)

6            In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Johnson must

7    establish two things.  First, he must establish that counsel's performance was deficient, i.e., that

8    it fell below an "objective standard of reasonableness" under prevailing professional norms.

9    <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984).  Second, he must establish that he was

10   prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that,

11   but for counsel's unprofessional errors, the result of the proceeding would have been different."

12   <u>Id.</u> at 694.  A reasonable probability is a probability sufficient to undermine confidence in the

13   outcome.  <u>Id.</u>

14           Johnson's delayed arraignment claim fails because he cannot show that he was prejudiced

15   by counsel's performance.  As discussed above, trial counsel did move to suppress the lineup

16   as unduly suggestive, but his motion was denied.  <u>See</u> <u>supra</u> at 9-10.  The Court has determined

17   that the trial court's denial of the motion did not violate the constitution, and that any error was

18   harmless because there was extensive physical evidence of Johnson's guilt.  <u>Id.</u> at 15.  In light

19   of this overwhelming evidence, Johnson cannot show that the result of the proceeding would

20   have been different had counsel further raised a "delayed arraignment" argument and the lineup

21   been suppressed based thereon.  Accordingly, the state court's rejection of this claim was not

22   contrary to, or an unreasonable application of, Supreme court precedent.  Johnson is not entitled

23   to habeas relief on this claim.

24

25   III.   <u>Right to Prompt Arraignment (Claim No. 4)</u>

26           Johnson claims that he was denied a prompt arraignment before the lineup discussed

27   above.   The state appellate court rejected this claim as forfeited and also on the merits:

28

Finally, defendant argues that he was denied his right to counsel at the lineup. He reasons that under section 849 [FN6] there was undue delay between his arrest and arraignment and that had he been timely arraigned he would have been assigned counsel who would have been present to object to the composition of the lineup. Defendant was placed under arrest in the afternoon of October 3, 2000. At the time of the lineup, 7:10 p.m. on October 4, defendant was in custody but had not been charged. He was charged on October 5 at 10:30 a.m. Given the number of charges and the extent of the investigation necessarily involved, there is no basis for any suggestion that the preparation of the complaint or the arraignment were delayed in order to avoid appointing counsel who would represent defendant at the lineup. Defendant was informed he had the right to counsel during questioning on October 3 and after the lineup on October 4, and on both occasions he expressly waived counsel.

> FN6. Section 849, subdivision (a) provides: "When an arrest is made without a warrant by a peace officer or private person, the person arrested, if not otherwise released, shall, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the offense is triable, and a complaint stating the charge against the arrested person shall be laid before such magistrate."

Defendant concedes that he did not raise the timeliness of his arraignment at the arraignment itself or at trial. A claim of unreasonable delay in arraignment "is forfeited for failure to raise it at arraignment or at trial." (*People v. Hughes* (2002) 27 Cal.4th 287, 326.) Moreover, defendant's argument hinges on the premise that the lineup was improperly conducted and that the presence of counsel would have ameliorated its unfairness. Having rejected the contention that the lineup was suggestive, defendant's argument regarding the arraignment logically fails as well.

Cal. Ct. App. Opinion, pp. 17.

In <u>Gerstein v. Pugh</u>, 420 U.S. 103, 125 (1975), the Supreme Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to extended detention following a warrantless arrest. The Court subsequently specified that "judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of <u>Gerstein</u>." <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44, 56 (1991); <u>see, e.g.</u>, <u>Jones v. City of Santa Monica</u>, 382 F.3d 1052, 1055-56 (9th Cir. 2004) (upholding city's post-arrest probable cause determination process on pre-printed form with sworn certification within 48 hours of time of arrest). If the probable cause determination does not occur within 48 hours, however, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." <u>McLaughlin</u>, 500 U.S. at 57. Neither intervening weekends nor the time required to consolidate pretrial proceedings qualifies as an "extraordinary circumstance." <u>Id.</u>; <u>see also</u> <u>Hallstrom v. City of</u>

17

1   Garden City, 991 F.2d 1473, 1480 (9th Cir. 1993) (interpreting this language in McLaughlin as

2   meaning intervening weekends and holidays).  A delay of more than 48 hours is presumptively

3   unreasonable.

4        According to the facts set forth by the state appellate court, Johnson was arrested in the

5   afternoon of October 3, 2000, and charged at 10:30 a.m. on October 5, 2000.  See supra at 17.

6   Therefore it appears that Johnson was timely arraigned within the 48 hour period set forth by the

7   Supreme Court.  See McLaughlin, 500 U.S. at 56.  Furthermore, it does not appear that there was

8   any unreasonable delay in the arraignment notwithstanding the 48 hour limitation.  The record

9   shows that the police were investigating a series of robberies and shootings, including one

10   homicide, that involved similar suspects; the number of charges involved necessitated an

11   extensive investigation as noted by the state court.  See supra at 17.  For example, there were

12   seventeen witnesses who were called for a lineup and three more witnesses in the hospital, which

13   indicates that the police had to interview at least twenty witnesses regarding the string of

14   robberies.  Id. at 9.  It is not surprising that the police needed at least a day before they decided

15   to place Johnson in a lineup and organize the presence of these numerous witnesses.  Johnson

16   was then immediately arraigned the morning after the lineup on October 5, 2000.

17        Furthermore, there is nothing in the record to indicate that the arraignment was delayed

18   for the purpose of delaying appointment of counsel.  Johnson was asked several times before

19   arraignment whether he wanted counsel, but he expressly waived it.  See supra at 17.  Even if

20   Johnson was not asked specifically if he wanted counsel for the lineup, he had no such right

21   because at that time it was not a critical stage of the prosecution as discussed above.  Id. at 15.

22   Johnson asserts in his traverse that the police could have arraigned him sooner based on

23   identification evidence gathered prior to the lineup, i.e., Winn, whose car Johnson carjacked,

24   Marquez, whom he robbed, and Santiago whom he robbed as well as shot.  Trav. at 4.  Be that

25   as it may, the reports of other incidents involving similar suspects gave the police reason to

26   believe that Johnson had attacked more than just these victims, and they had a duty to execute

27   a thorough investigation before pressing charges against Johnson.  Their thoroughness was

28

18

1   justified as Johnson was ultimately charged with 20 crimes, including homicide.  See supra at

2   1-2.

3       Based on the foregoing, the state court's rejection of this claim was not contrary to, or an

4   unreasonable application of, Supreme court precedent.  Johnson is not entitled to relief on this

5   claim.

6

7   IV.   Right to Fair and Independent Review (Claim No. 3)

8       Johnson's final claim is that he was denied a "fair and independent [appellate] review"

9   because a pro tem justice on the appellate court panel that decided his case was a superior court

10  judge from the same county and courthouse in which his trial was held.  This claim was denied

11  summarily on direct review by the California Supreme Court (Ans., Ex. H), which also denied

12  it summarily when presented in a habeas petition (id., Ex. K).

13      The Due Process Clause guarantees a criminal defendant the right to a fair and impartial

14  judge.  See In re Murchison, 349 U.S. 133, 136 (1955); Kennedy v. Los Angeles Police Dep't,

15  901 F.2d 702, 709 (9th Cir. 1990).  A "biased decisionmaker [is] constitutionally unacceptable."

16  Withrow v. Larkin, 421 U.S. 35, 47 (1975).  There are two general ways in which a defendant

17  may establish that he was denied his constitutional right to a fair and impartial judge.  In some

18  cases, the proceedings and surrounding circumstances may demonstrate actual bias or an

19  appearance of advocacy on the part of the judge, i.e., improper conduct.  See Taylor v. Hayes,

20  418 U.S. 488, 501-04 (1974); Stivers v. Pierce, 71 F.3d 732, 741 (9th Cir. 1995) (civil context).

21  In other cases, the judge's pecuniary or personal interest in the outcome of the proceedings may

22  create an appearance of partiality that violates due process, i.e. improper influences.  See id.

23      A claim of judicial misconduct by a state judge in the context of federal habeas review

24  does not require that the federal court simply determine whether the state judge committed

25  judicial misconduct; rather, the question is whether the state judge's behavior "rendered the trial

26  so fundamentally unfair as to violate federal due process under the United States Constitution."

27  Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted), cert. denied, 517 U.S.

28

1158 (1996).

Johnson has failed to show that the judge at issue was involved in either improper conduct or improper influence. Johnson makes general allegations that the judge had a "high level of interference" and that he was "part of the prosecution," Trav. at 10, but fails to support these assertions with specific facts. In addition, his argument that there is an "appearance of bias" and "undue deference" from the mere fact that the pro tem judge was a "superior court judge from the same court in the same building" as where his trial took place is mere speculation and also not supported by any facts. Id.

The crux of Johnson's claim is that the judge in question had a conflict of interest because he was a judge out of the same county superior court where Johnson's trial took place, and therefore must have had a "peer" relationship with the judge who presided over Johnson's trial. Without any other facts, Johnson would have this Court find that this relationship per se implies a bias. Assuming that such a relationship actually existed and that the pro tem judge was aware that one of his peers had presided over Johnson's trial, there is no evidence that his bias alone influenced the other two judges on the panel to ultimately deny the appeal. Furthermore, in federal habeas review, the issue of judicial misconduct turns on whether the alleged behavior "rendered the trial . . . fundamentally unfair." Duckett, 67 F.3d at 740 (emphasis added). Even if we assume that the Johnson's appeal was denied because one of the appellate judges was biased, it cannot be said that a tainted appeal decision rendered Johnson's trial fundamentally unfair. As discussed above, this Court found no merit in any of the claims that were rejected by the state appellate court and found no violation of Johnson's federal right to due process. Accordingly, Johnson is not entitled to habeas relief based on this claim.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

1  Johnson may seek a certificate of appealability from the Ninth Circuit Court of Appeals.  The

2  clerk shall enter judgment in favor of respondent, and close the file.

3

4        IT IS SO ORDERED.

5

DATED: May 23, 2014                    _____

6                                        SUSAN ILLSTON
                                       United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21